kaw

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **RURAL WATER DISTRICT NO. 4,** | ) | |
| **DOUGLAS COUNTY, KANSAS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 07-2463-JAR** |
| | ) | |
| **CITY OF EUDORA, KANSAS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Rural Water District No. 4, Douglas County, Kansas ("Rural"), filed this Complaint under 42 U.S.C. § 1983, claiming that it is protected under 7 U.S.C. § 1926(b), which gives it the right to provide water service to its service area. Rural claims that defendant City of Eudora ("City") violated § 1926 by annexing certain properties within its service area and proceeding to enforce the provisions of K.S.A. § 12-527, allowing the City to purchase Rural's assets. Rural seeks damages, a declaratory judgment, and an injunction. The City filed a counterclaim for tortious interference with a business advantage, fraud, abuse of process, and for declaratory relief.[1]

Before the Court is the City's Motion for Summary Judgment (Doc. 150), Rural's Motion for Partial Summary Judgment (Doc. 151), and a host of related motions. The City seeks summary judgment on Rural's § 1983 claim, declaratory, and injunctive relief claims and on its declaratory counterclaims. Rural moves for judgment on its § 1983 claim, its declaratory relief

---

[1] The City's tort claims were dismissed without prejudice (Doc. 231.)

claim, and its injunctive relief claim.  Rural also seeks judgment on the City's counterclaims and affirmative defenses.

## I.       DAUBERT MOTIONS

The Court has broad discretion in deciding whether to admit expert testimony.[2]  Fed. R. Evid. 702 provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[3]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[4]  In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[5]  Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[6]  An expert opinion "must be based on facts which enable [him] to

---

[2]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted).

[3]Fed. R. Evid. 702.

[4]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[5]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[6]*Id.* (quoting *Daubert*, 509 U.S. at 597).

express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[7]  And it is not necessary to prove that the expert is "indisputably correct," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[8]

*Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[9]  But "the gatekeeping inquiry must be tied to the facts of a particular case."[10]

It is within the discretion of the trial court to determine how to perform its gatekeeping function under *Daubert*.[11]  The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[12]  In this case, the parties have agreed that a hearing is not necessary, and rest on their written submissions.  The Court has carefully reviewed the exhibits filed with the motion and believes this review is sufficient to render a decision upon the motion to exclude without conducting an oral hearing.

A.    *Defendant's Motion to Exclude Expert Ray L. Connell (Doc. 148)*

---

[7]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[8]*Id.*

[9]*Daubert*, 509 U.S. at 593–94.

[10]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotations omitted).

[11]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[12]*Id.*

Defendant does not contest the qualifications of plaintiff's expert, but rather insists that the testimony is unreliable and that some of his opinions are outside the scope of his proposed testimony. Plaintiff counters that Connell's opinion is reliable as it is in line with defendant's expert testimony on the issue.

Connell intends to testify that K.S.A. § 12-527 is a mandatory statute and that when the City annexed portions of Rural, it was required to purchase Rural's property. Rural claims that the mandatory nature of § 12-527 makes it clear that the City "curtailed or limited" its right under § 1926(b), the ultimate issue for the Court to decide and the issue presented to the trier of fact.

K.S.A § 12-527 provides that:

> (a) Whenever a city annexes land located within a rural water district organized pursuant to the provisions of K.S.A. 82a-612 et seq., and amendments thereto, the city shall negotiate with the district to acquire title to all facilities owned by the water district and used for the transportation or utilization of water distribution to the water district benefit units within the area annexed by the city. Title shall vest in or become the property of the city upon payment by the city to the water district of the reasonable value of such property, as agreed upon by the governing body of the city and the board of directors of the district. If the district is unable to reach agreement with the city on the reasonable value for such facilities, then the reasonable value shall be determined in the following manner:
> (1) The district and the city shall each select one qualified appraiser and the two appraisers so selected shall then select a third appraiser for the purpose of conducting appraisals so as to determine reasonable value of the property, facilities and improvements of the district annexed by the city.
> (2) The agreement or decision of at least two of the three appraisers shall be the fair market value presented to the city for payment and the district for acceptance.
> (3) If either the district or the city is dissatisfied with the decision of the appraisers, then the district or the city may institute an action in the district court to challenge the reasonableness of the

value determined by the appraisers.

The Tenth Circuit has provided that "while expert witnesses may testify as to the ultimate matter at issue . . . this refers to testimony on ultimate facts: testimony on ultimate questions of law, i.e., legal opinions or conclusions, is not favored."[13]  This is exactly what plaintiff intends to do with its expert witness.  In his declaration of report,[14] Connell states that he is an attorney with substantial experience in litigating § 1926(b) actions.  He states that he is "very familiar with 7 U.S.C. § 1926(b) and its application in response to municipal encroachments."  In his opinion, Connell explores the legislative history and opines about the purposes of § 12-527.  In fact, his opinion is actually a "brief" in support of plaintiff's position on the meaning of § 12-527, an issue hotly contested in this case.  He ends his opinion with the conclusion that the City's threatening letters and mandatory language of § 12-527, in his "personal and legal opinion," means that the "Water District not only had a right, but an affirmative duty to file for federal protection from the City's actions of threatening the taking of Water District rights in contradiction of its Federal protection."[15]

Connell's testimony is nothing more than his "legal" opinion as to the law.  In fact, Connell acknowledges that courts disfavor such testimony by citing to *Specht v. Jensen*,[16] Tenth Circuit precedent on this issue.  Any opinion on the legal effect of § 12-527 on the protection under § 1926(b) is a question of law for the Court.  Accordingly, defendant's motion is granted.

---

[13]*Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007) (citing *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1998)).

[14](Doc. 149, Ex. 1.)

[15](Doc. 149, Ex. 1.)

[16]853 F.2d 805 (10th Cir. 1998).

B.      *Defendant's Motion to Exclude Expert Testimony of James W. Challis (Doc. 157)*

Challis is apparently highly skilled and qualified to give expert testimony.  Challis has a

bachelors degree in civil engineering and a masters degree in structural engineering.  He has

thirty-three years of experience, with an emphasis on design, project management, computer

analysis, and has worked with seven other water districts, in the past or present.  He holds

professional licenses in Kansas, Missouri, and Nebraska.  Being a licensed engineer, however,

does not mean that Challis possesses sufficient knowledge to testify about any engineering

issue.[17]  Challis proposes to testify regarding the Garber Property and Rural's ability to make

"service available" in that area.[18]  Challis's testimony is as follows:

> (1) that in general, a property owner or developer such as the Garber Property would
> request water service some four to six months prior to development of the project; (2)
> that in larger scale project developments involving one or more lots, the property
> developer constructs the on-site facilities and then conveys those facilities and structures
> to the water district; (3) generally, the property developer pays for "all, part, or none of
> any off-site facilities" necessary in providing water service to the area;[19] (4) that when the
> request for water was made, Rural had the ability to service the area because it had
> sufficient lead time to develop and complete engineering studies and it had a 2 ½ inch
> main on the Garber Property that would have provided potable water; (5) that if a request
> was made today, the water could be connected in due course; (6) the practice developed
> by Rural of having land owners pay for all on-site developments and paying for "all,
> some, or none of the costs" of off-site developments does not generate more than a fair
> profit to the district; (7) that the total cost to connect the Garber Property would be
> $126,000, with a cost of only $10,000 to Doug Garber; and (8) the connection fees
> charged by similarly situated water districts is comparable to that charged by Rural.

---

[17]*See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (noting that merely possessing a medical degree is not sufficient to permit testimony about any medical issue).

[18]The evidence provided by Challis regarding the "made service available" prong is relevant to whether Rural was capable of making service available and whether the cost of those services to the landowner were so high as to effectively make service unavailable.  *See infra* VI, D, p.39. Standard for "made service available."

[19]Challis' opinions change where Rural would be required to provide "total" water service; that is, water service with fire protection requiring a minimum level of water pressure.  Those opinions are not admissible.  *See infra* VI, D, p. 46.

The City seeks to exclude the testimony of Challis about the "made service available" element of Rural's claim.  The City claims that Challis' testimony is outside of his area of expertise,  is unreliable, and will not aid the trier of fact in determining a fact in issue.  The City claims that Challis serves as a "rubber stamp" for Rural's arguments and contentions, simply following an outline scripted by Rural's counsel.

Though Challis apparently could have developed his own outline on the engineering and structural requirements in providing water service to the Garber Property, the evidence suggests that Challis merely agreed with most of what Rural's counsel developed in his outline.  During his deposition, Challis admitted that he received an outline detailing Rural's objectives.  Indeed, the outline is almost identical to Challis' report.  In fact, Challis literally filled in the blanks in some places.  When asked about the specific lead time required in the Garber project, Challis did not know.  When asked if that was discussed, Challis again responded "no."  In fact, Challis admitted that he did not specifically know about the Garber Property, but relied upon the outline provided, as he did not speak to Garber about the development.  He also stated that because of the cost of off-site development to the land owner—ranging from all to nothing—a potential land owner could be saddled with both on-site and off-site development costs, effectively raising the cost of obtaining service.  In Challis's opinion, any such cost would be in the range of costs that are common for connection.

 The fact Challis is unable to testify specifically about the Garber Property however, does not render inadmissible his analysis of the made service available prong.  In fact, Challis's substantial experience qualifies him to opine on the cost of developing pipes and infrastructure for such a project.  The Court believes that Challis' testimony regarding a straw-man property

would be helpful in determining whether a 2 ½ inch main could provide a similar customer in the Garber position with potable water service.  Moreover, Challis states that his testimony was based on a review of the Garber plat that had been sanctioned by the County Commissioners and approved for construction.  Therefore, just because Challis has not specifically communicated with Garber about his needs does not mean he cannot render an opinion regarding the planned development based on the schematics viewed from the approval of the project.

In his supplemental affidavit, Challis reiterates his opinion that Rural would be responsible for a substantial portion of any infrastructure needed to attach pipes to the Garber Property.  He also testifies that Rural would be able to provide services at a reasonable rate, in essence providing evidence of the reasonable nature of Rural's prices for water services.  As discussed below, the *Post Rock* test requires a showing that Rural did not yield more than a fair profit.[20]  Here, Challis opines that Rural's profits would not be unreasonable, testimony this Court believes is better suited coming from an accountant or financial officer, and outside Challis' expertise as an engineer.  Challis also formulates an opinion about service to other properties within the district without completing an engineering report on those properties or without referencing some planned development of the property.  Those opinions are unreliable, lacking any foundation.  In the end, Challis may properly testify about the infrastructure required to provide service to the Garber Property and the cost of developing that infrastructure because that information is relevant and could help the trier of fact determine whether Rural made service available.  His other opinions regarding the cost of infrastructure for other properties in the district and the district's ability to recoup more than a fair profit for its service are unreliable,

---

[20]*See infra* VI, D.

either outside the scope of his expertise or based on unreliable information.

Accordingly, Challis will be permitted to provide expert testimony regarding the engineering infrastructure required to connect the Garber Property to the water district and the ability of the 2 ½ inch main to meet potable water standards.  He may testify to the cost of developing the infrastructure, but not the cost billed to Garber or the cost billed to the water district.  Challis will be permitted to testify regarding the current state of the infrastructure on the other properties if he has done an engineering study of the infrastructure, but not the cost associated with connecting a prospective customer that has not submitted plans or requested service.

C.    *Defendant's Motion to Exclude Expert Testimony of Scott D. Schultz (Doc. 159)*

Scott D. Shultz is the District Administrator for Rural.  His affidavit notes that he was not called to express an expert opinion, but that if called, he would express the opinions detailed therein.  Shultz states that he has reviewed the expert report of Challis and is aware that Garber is the only property owner in this action that has requested water service from the district.  Shultz has been employed as District Administrator for over seven years.  He is a certified public accountant with a master of science in taxation and a bachelor of business administration.  Shultz is a certified Class IV Water Systems Operator, the highest designation in the state of Kansas, which grants him the ability to operate any water system in the state.  Shultz states that in his experience as District Administrator, he has a wide swath of knowledge in all areas of the operation, including the district's ability to provide water to its current customers and the design, building, and placement of infrastructure to provide service to prospective customers.  Shultz has experience in planning and implementing water service for large projects, including financing,

negotiating contracts, oversight of construction, design, and installation of pumps and pipe lines for the service of water.  As District Administrator, Shultz is the first to know of a request for water service from a prospective customer.  In that capacity, he reports to the engineers the customer's expected water needs and subsequently uses the engineers' report to explain to the district's board of directors the district's capacity to provide water service to the prospective customer.

Shultz intends to testify that:

(1) the customary lead time for developing water infrastructure to service a project such as the Garber Property is 6-12 months; (2) in the development of a project such as the Garber project, the customer is responsible for paying for all on-site facilities needed to provide water service, and must convey those facilities to the district upon completion; (3) the developer is responsible for paying for construction of all or some of the off-site facilities needed to provide water to the property; (4) water service for the Garber Property was first requested on August 27, 2007; (5) at the time water was first requested for the Garber Property, the district had a 2 ½ inch water main on the Garber Property; (6) in the case of the pipe being present on the property, it would have taken 30-45 days to connect to the district's water source; (7) because the main was on the Garber Property, there would have been no off-site cost to Garber because there were facilities on-site; (8) the time needed to make application to the district, to perform the engineering study, and to construct the 8-inch main would normally be 90-180 days; (9) the engineer's cost estimate of $114,000 for line extension and $12,900 for engineering inspection are within the normal cost range for providing water service to comparable properties; (10) the district would make no profit from onsite or offsite construction required; (11) similarly situated water districts follow the same line of charge for new properties and construction of infrastructure; (12) the district has facilities in the undeveloped areas where no property owner has requested water, according to engineers; (13) the facilities in those areas meet the water requirements according to district engineers; and (14) the district has incurred costs associated with this litigation in an amount exceeding $65,000.

The City argues that Shultz is not qualified to testify as an expert because he does not have the expertise in the area in which he intends to testify; Shultz provides conclusory testimony on legal issues before the Court; any testimony regarding the new cost structure the water district implemented after September 12, 2007, is irrelevant to whether the rates for water

service were unreasonable and confiscatory; Shultz cannot adopt the expert opinion of Challis; and Shultz cannot offer expert opinion regarding the district's ability to provide water to undeveloped annexed areas.  Finally, even if the testimony is offered as lay opinion testimony under Rule 701, Shultz may not testify because most of the information he seeks to testify to is outside his perception and knowledge.

Rural first notes that the majority of the testimony proffered by Shultz is lay opinion testimony under Fed. R. Evid. 701, not expert testimony under 702.  Furthermore, even those opinions that could rightfully be classified as expert opinions are admissible because Shultz is qualified by experience and knowledge to state the opinions he offers above.

The Court agrees that Shultz's testimony fails the analysis under Rule 702.  Although Shultz seeks to verify that Challis' opinions are correct, he has not formulated his own report; instead, Shultz states that he has reviewed Challis' report and agrees with the conclusions made therein.  While an expert may give his opinion as to another expert's analysis, there is nothing in Shultz's background that makes him capable of rendering such an opinion.  Shultz essentially agues that he is capable of confirming the expert opinions of Challis because he has been the District Administrator for over seven years.  This experience, in the Court's view, does not grant Shultz expertise in the field of engineering.  What Shultz wants the Court to believe is that through his years as District Administrator, he has developed expertise in laying infrastructure for connection of pipes, facilities, and water mains throughout the district's territory, and in the case of the Garber Property, he is intimately familiar with the engineering requisites for providing water to the development.  The Court does not doubt that Shultz is aware of a wide range of the matters in the district, but the Court does doubt whether Shultz, is capable of

11

rendering an expert opinion regarding the engineering requirements of providing the infrastructure to the Garber Property or any other property throughout the district.[21]

This is evident in Shultz's own proffered opinion.  In items 6 and 7 above, Shultz states that because there are pipes along the Garber Property, the district is capable of providing water service to meet that property's need.  In items 12 and 13, he concludes based on information received from engineers that the district is capable of providing water service to those areas even without conducting an independent study as he would have done with the Garber Property.  It seems likely that Shultz is only verifying the information he has received from engineers rather than conducting his own independent engineering study.  Accordingly, Shultz will not be permitted to testify as an expert, nor will he be able to essentially bolster Challis' expert testimony by stating his opinion that he agrees with the engineering conclusions.  Those conclusions include items 1, 6, 7, 8, 9, 12, and 13 above.

Another issue is whether Shultz may give lay witness opinion.  Fed. R. Evid. 701 provides that:

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

---

[21]Though Shultz may have knowledge of the customary lead time and Rural's ability to provide water through its infrastructure already in place, Shultz cannot testify to how those pieces of infrastructure interact to provide water service to the Garber Property.  In fact, the Court thinks that as District Administrator, the engineers would inform Shultz of the lead time, the infrastructure in place, and the infrastructure's capacity to provide water service.  If left to do his own engineering study, however, the Court is of the view that Shultz's degree in taxation and variety of experience would not serve him well in completing the study.

Admission of lay witness testimony is within the discretion of the trial judge.[22]  Ordinarily, lay witness testimony must be based on concrete facts within the witness' perception.[23]  This perception requirement requires a lay witness to have first hand knowledge of the events he seeks to testify to.[24]  As a prerequisite to any lay witness testimony, a foundation must be laid at trial showing that the witness has the knowledge, perception, or observations to render the opinions.  The remaining issues appear to be within Shultz's knowledge as District Administrator.  In any event, a timely objection and vigorous cross examination is usually a better tool for ferreting out a lay witness' reasons for testifying in a certain manner.  Accordingly, the remaining issues Shultz intends to testify to may be admissible depending on his knowledge of the facts underlying his testimony.

      D.      *Plaintiff's Motion to Exclude the Expert Testimony of Brian Kingsley (Doc. 154)*

Brian Kingsley obtained his bachelor of science degree in civil engineering from the University of Kansas and is a registered engineer in the state of Kansas.  He has provided engineering services dealing specifically with waterline systems for municipal and rural water clients.  He has worked on a wide range of facilities dealing with water systems development, including modeling water distribution systems, recommending system upgrades, and preparing construction plans for system improvements.  Kingsley has been involved in a number of water system projects, from smaller water suppliers to larger suppliers throughout the state.  Kingsley intends to testify that:

---

[22]*United States v. Banks*, 262 Fed. Appx, 900, 906 (10th Cir. 2008).

[23]*United States v. Bush*, 405 F.3d 909, 915-16 (10th Cir. 2005).

[24]*Id.* at 16.

(1) a 2 ½ inch water main is not sufficient to provide municipal potable water service for a twenty-two lot subdivision.  That is because the Kansas Department of Health and Environment ("KDHE") distinguishes between water systems for potable water and fire systems with the capacity to provide fire protection, and the 2 ½ inch main is insufficient to meet KDHE standards; (2) county and municipal zoning require different water needs.  Applying the municipal density development standards, Rural does not provide enough water pressure; (3) if water was provided to the Garber Property as announced by Challis, the service would not meet KDHE or the American Water Works Association ("AWWA") standards; (4) the normal working pressure of water necessary under KDHE criteria is approximately sixty pounds per square inch ("psi") and pressures that fluctuate by more than ten psi or are less than forty psi are not adequate; (5) KDHE requires that mains used for fire protection should be at least six inches; (6) KDHE and AWWA standards require the firm capacity of the booster station to meet water demands without all the booster pumps running; (7) Challis' statement that the mains have the capacity to provide water demands of KDHE is calculated with all pumps running; (8) the standard fire flow for residential is 1000 gpm to 1500 gpm.  Rural's stated 500 gpm to 750 gpm is below standards; (10) parallel waterline systems for domestic and fire protection are not standard practice and are not economical water systems; (11) the cost to connect the Garber Property to the City's system is $13,634; and (12) 30.9 psi is a substandard water pressure for providing water service under KDHE.

Rural moves to prevent admission of Kingsley's testimony on the basis that it is irrelevant because the ability to provide fire protection is not a part of the made service available test.  The parties have briefed this issue extensively and it is analyzed below.[25]  Because the Court finds that fire protection is irrelevant to whether a water district has made service available, any opinions regarding whether Rural has the capacity to provide fire protection will not be admissible.

Rural claims that any remaining opinions presented by Kingsley are also inadmissible because the information is unreliable.  Rural claims that Kingsley did not rely on any study, did no examination of the difference between rural water standards and more densely populated areas, did no study regarding the pressure fluctuation to expect with a 2 ½ inch main, and based

---

[25]*See infra* VI, D.

his opinion that the main is not large enough to accommodate the Garber Property on customer needs without any underlying customer analysis.  In response, the City contends that Kingsley's opinion is based on experience in fielding complaints from rural customers and assessing their home needs and expectations.  After reviewing the deposition testimony, the Court believes Kingsley's testimony is unreliable, as its does not rest on any reliable examination or any cognizable test.

Indeed, Kingsley's testimony illustrates the inadequacy of the testing he used to formulate his opinion of customer water pressure needs and expectations.

> The experience that I have is fielding complaints from municipal residents and fielding complaints from rural residents. Generally speaking, a rural resident is going to be happy to have a potable water supply that doesn't require electricity to pump out of the ground from a well, and they're going to be more accepting of variations in water pressure; whereas a municipal resident is going to expect to have potable water system where they can take a shower and not notice a large fluctuation of pressure during – where they can take a shower while they're watering their lawn, for example.
>
> Generally speaking, when I see pressures that fluctuate by more than 10 psi, I've seen calls generated to a municipality saying, "We believe there's a problem with our water pressure." It's not meeting their expectation, and that's what I'm basing my comments on.

This is a wholly unreliable basis for Kingsley's proposed testimony regarding customer expectations.  Here, the Court cannot admit expert testimony based on Kingsley's fielding of complaints from rural or urban water customers.

Nonetheless, the City argues that there is no requirement that Kingsley's knowledge and experience be an exact fit regarding every issue to which he intends to testify.  The City is correct that on occasion an expert is permitted to testify to issues outside her area of expertise, as

15

"a lack of specialization does not affect the admissibility of the opinion, but its weight."[26] Additionally, there is no requirement that an expert's methods be perfect, but whether those conclusions are reliable should be based on more than the *ipse dixit* of the expert.[27]  In this case, Kingsley has not provided the Court with any grounding for his expert customer analysis testimony.  Rather, he states that he can make these conclusions from the mere fact that he fielded complaints from customers.  As explained below, the Court believes that Kingsley's analysis of the customer expectations is inadequate under all four *Daubert* factors.

First, there is no actual test for Kingsley's opinion of customer expectation.  Second, there is no known rate of error in Kingsley's testing based on his fielding of complaints. In fact, based on Kingsley's testimony, whether a person would complain about his water pressure depends on that person.  Indeed, he acknowledged that some people will complain while others will not, and that some people will complain about "everything."  Kingsley finally acknowledged that expectation was really unique to each individual.  Finally, although there is probably a general acceptance of customer analysis in any field, there are usually guidelines in formulating those tests.  Finding no real guidance for Kingsley's conclusions, the testimony is not admissible.

Finally, Rural argues that any additional opinions by Kingsley are inadmissible because Kingsley admits to applying the wrong standards in determining whether a 2 ½ inch main is enough to provide a potable water service to the Garber Property.  Rural claims that Kingsley failed to correctly apply KDHE and AWWA municipal standards when examining the pipes

---

[26]*Wheeler v. John Deere Co.*, 935 F.3d 1090, 1100 (10th Cir. 1991).

[27]*Windham v. Circuit City Stores, Inc.*, 420 F. Supp. 2d 1206, 1211 (D. Kan. 2006).

16

located near the Garber Property for water service.  Citing to his deposition testimony, Kingsley admits that he is not familiar with any distinguishing factor between the municipal and rural water standards under KDHE.  In fact, he acknowledges that he did not contact the KDHE to gather information about the differences in rural water standards and municipal standards.

Kingsley's rebuttal to Challis' testimony that the 2 ½ inch main is large enough to provide potable water service is based on some criteria and standards.  Kingsley based his review on KDHE and AWWA standards.  Although he admits that he is not aware of the explicit difference between rural water standards and municipal water standards, the issue of whether the Garber Property is within a municipality is answered in the affirmative, as it has already been annexed by the City.  Accordingly, Kingsley's testimony regarding the capacity of the 2 ½ inch main's ability to meet KDHE and AWWA standards is helpful to the trier of fact in determining whether Rural was capable of making service available.  Therefore, Kingsley will be able to testify regarding the ability of the 2 ½ inch main to meet the KDHE and AWWA expectations, as well as the cost of connecting the Garber Property to the City.  He will not be permitted to testify about customer expectations.

## II.   LIMINE MOTIONS

### A.   *Defendant's Motion in Limine to Exclude Evidence of Alleged Threats to Garber (Doc. 198)*

The City moves for an order preventing Rural from offering evidence of the alleged threat to Mr. Garber.  The City argues that evidence of Ms. Beaty's alleged threat is irrelevant and prejudicial because the allegation is simply not true.  In fact, argues the City, Mr. Garber himself has come forward to deny any allegations of a threat of de-annexation by the City.  Furthermore, the alleged threat is irrelevant because threats do not violate § 1926(b), and even if

a threat did violate § 1926(b), Ms. Beaty did not have the authority to bind the City.  Finally, the City argues that any testimony by Garber regarding the conversation his attorney, Catherine Theisen, had with a third party is barred by the hearsay rule as double hearsay.

Rural counters that the alleged "threat" to Mr. Garber served to prevent him from completing his project, and effectively prevented Rural from providing water service.  Rural argues that Ms. Beaty's statements to Mr. Garber that he would not receive other essential public services if he connected to Rural's water supply prevented Garber from completing his project and "curtailed or limited" Rural's ability to provide water service to the Garber Property. Accordingly, the evidence is relevant to determining the fact in issue: whether the City acted to "curtail or limit" Rural's ability to make water available.

Federal Rule of Evidence 401 provides: "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Federal Rule of Evidence 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  The trial court has wide discretion in determining whether to exclude relevant evidence under Rule 403.[28]

The City's argument that the threat is irrelevant because it did not occur is far off base. Rural's theory is that Ms. Beaty's "threat," along with letters sent to Garber's attorney, essentially gave Garber an ultimatum: obtain water from the City or the City will not provide the

---

[28]*Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1274 (10th Cir. 2000).

project with any sewer, street, or other basic services as needed to make the housing project successful and profitable.  In fact, Garber testified that if he was unable to get sewer and other basic services, the project could not go forward.  The City's ability to prevent the construction of those basic services would leave Mr. Garber with "something [he] couldn't use."

Though Mr. Garber has since testified that he did not believe that Ms. Beaty was "threatening" him, he did state in his prior testimony that he was told to cease construction because he would not be provided with any services from the City.  Additionally, as Rural notes, this demand or threat is not the only evidence that Mr. Garber's ability to obtain water from Rural was hindered because the City could not provide him with any other necessary services that he needed to successfully construct his housing project.  As the intended use of the evidence is to show, for lack of a better term, a strong-arm tactic by the City to ensure that Garber used the City water services, the evidence is highly relevant and thus admissible.

The City's argument that Ms. Beaty's statements should not be admitted because she did not have the authority to bind the City to any de-annexation is also off base.  Again, Rural's theory does not appear to be that Garber actually knew that the City would de-annex his property, but that he would not have the ability to obtain water from Rural because the City would not provide any basic services if that were the case.  De-annexation from the City is merely one means of not receiving City services.  In any event, there appears to be ample evidence in the record to suggest that Ms. Beaty, as City Administrator, had the ability to bind the City to any alleged de-annexation.

Finally, any evidence offered from Catherine Theisen, Mr. Garber's attorney, is not hearsay because it is not offered for the truth of the matter asserted.  "'Hearsay' is a statement,

other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[29]  Rural argues that the statements by Mr. Garber's attorney are not offered for the truth of what those statements convey, but to show why Mr. Garber halted construction on the Garber Property.  Rural's argument assumes certain legal issues that the Court can easily resolve.  The City's objection is that information stated to Mr. Garber's attorney by a third person and later conveyed to Mr. Garber is hearsay within hearsay.  Hearsay within hearsay requires either an exception or an analysis that both hearsay statements are not hearsay.[30]  Here, Rural merely offers an analysis on one level of the hearsay statements—those stated to Garber by his attorney, not on the statements conveyed to Ms. Theisen by a third person.  Accordingly, any such statements meeting this double hearsay analysis will be inadmissible.

Except for the otherwise inadmissible hearsay, the City's motion to exclude testimony of the alleged "threat" to Mr. Garber is denied.

B.    *Defendant's Motion to Exclude as Evidence Letters from City Attorneys (Doc. 199)*

In this motion, the City seeks to prevent admission of four letters written by City attorneys to Rural and Garber's attorney.  The City claims that the letters are irrelevant because they do not show a violation of § 1926(b) and because the City's attorneys did not have the authority to bind the City to any procedure under K.S.A. § 12-527.  Again, Rural asserts that the letters are relevant, to show that the City used this correspondence to "curtail or limit" its ability to serve water within its territory.  Moreover, the fact that these letters alone do not prove that an

---

[29]Fed. R. Evid. 801(c).

[30]*Boren v. Sable*. 887 F.2d 1031, 1031 (10th Cir. 1989).

actual "curtailment or limitation" occurred does not make them irrelevant to the ultimate issue.

The correspondence between the City and Rural and between the City and Mr. Garber's attorney is relevant. As stated above, Rural argues that the City is preventing it from providing services to the Garber Property by effectively giving Mr. Garber an ultimatum. The letters detail negotiations between the City and Rural on the purchase of certain assets from Rural and the City's ultimate use of K.S.A. § 12-527 to determine the appraised value of Rural's territory. According to Rural, the statute requires sale of Rural's assets, which in turn does "curtail or limit" Rural's ability to provide water service and repay its obligation guaranteed by the federal government. As such, the letters show that the City was willing to compete with or had the intent to "curtail or limit" Rural's ability to serve its territory.

The City argues, nonetheless, that the letters are not admissible because the attorneys for Rural intend to use the letters to convey their theory of the case. But, the City also has the ability to form its own interpretation of the letters and have that issue decided by the jury. In fact, that seems to the be the ultimate issue before the Court. Without detailing the letters,[31] it is suffice to say that the letters are relevant and admissible.

The City also contends that the letters are not relevant because the City attorneys did not have the ability to bind the City. The Court is of the view that even without the ability to bind the City, the letters would be relevant, as they tend to make an issue in fact more or less true. Furthermore, the Court agrees with the law provided by Rural that the City attorneys act on behalf of the City and are able to confirm binding obligations. Here, the letters came from the City Attorney or from the City's retained attorneys, all of whom had the power to bind the

---

[31]The letters are laid out in further detail below. *See infra* IV.

client.[32]  Here, as explained by Rural, the letters involved the legal right of the City and in the letters, Mr. Waters identifies himself as the "City Attorney."  Accordingly, an agency analysis is not required for the evidence to be relevant.[33]  The City's motion is denied.

      C.     *Plaintiff's Motion in Limine to Exclude Evidence of Rural's Alleged Obligation to Provide Fire Protection (Doc. 214)*

Rural has filed a motion to eliminate any reference to Rural's alleged obligation to provide fire service to the disputed area.  Rural claims that under federal law, it does not have an obligation to provide fire service to its service area to obtain § 1926(b) protection.  The City has not responded to Rural's motion.  In any event, the issue of fire protection is decided below.[34]  Accordingly, that motion will be granted as fire protection is irrelevant to whether a water district has made service available under § 1926(b).

## III.    MOTION TO RECONSIDER (Doc. 195)

The City filed a motion to reconsider the Court's Order on it's motion to certify issues to the Kansas Supreme Court.  As the Court has effectively ruled on those issues in this order, that motion is denied as moot.

## IV.    UNCONTROVERTED FACTS

Rural Water District No. 4 of Douglas County, Kansas is a rural water district incorporated under the provisions of K.S.A. § 82a-612 et seq. on July 16, 1973.[35]  At the time of

---

[32]*Reimer v. Davis*, 580 P.2d 81, 85 (Kan. 1978).

[33]Even if the Court accepted the City's view that Rural is required to brief the issue of agency, the fact of the matter is that the City is not prejudiced by the lack of briefing as it was its attorneys that wrote the letter. Furthermore, the letters themselves, serve as evidence that the attorneys were agents acting on the City's behalf.

[34]*See infra* VI, D.

[35](Doc. 153-3.)

incorporation, Rural was a water district servicing areas of Douglas County.[36]  The purpose of a rural water district under Kansas statutes is to "promote the public health, convenience and welfare."[37]  In addition, Rural's bylaws provide that Rural was developed:

> (a) To acquire water and water rights and to build and acquire pipelines and other facilities, and to operate the same for the purpose of furnishing water for domestic, garden, livestock and other purposes to owners and occupants of land located within the District, and others as authorized by these bylaws.
> (b) To borrow money from any Federal or State agency, or from any other source, and to secure said loans by mortgaging or pledging all of the physical assets and revenue and income of the District, including easements and right-of-ways.
> (c) To hold such real and personal property as may come into its possession by will, gift, purchase, or otherwise, as authorized by law, and to acquire and dispose of such real and personal property, including rights-of-way and easements, wherever located, and as may be necessary and convenient for the proper conduct and operation of the business of the District.
> (d) To establish rates and impose charges for water furnished to participating members and others.
> (e) To enter into contracts for the purpose of accomplishing the purposes of the District with any person or governmental agency.
> (f) To cooperate with any person or with any governmental agency in any undertaking designed to further the purposes of the District.
> (g) To do and perform any and all acts necessary or desirable for the accomplishment of the purposes of the District, which may lawfully be done by such District under the laws of the State of Kansas.[38]

In March 2003, Rural filed a petition with the Douglas County Clerk, seeking to expand its territory as a part of the Johnson 6 project.  Sometime before May 28, 2003, at the Douglas County Commissioners meeting, the Cities of Lawrence and Eudora suggested an interlocal

---

[36](Doc. 153-3.)

[37]*Infra* note 84.

[38](Doc. 152-13.)

agreement with certain conditions regarding "(1) annexation of new or existing facilities outside the current District boundaries and within a specified area up to three miles around each City; and (2) the extent of platting that should be required when any new District facilities are installed outside current District boundaries within the specified area."[39]  In a memorandum to the Members of Lawrence-County Planning Commission, Rural suggested that conditions be attached to the district's petition for expansion, rather than the drafting of an interlocal agreement.[40]  The memorandum stated that "(a) such conditions would have the force of law and would be absolutely binding upon District."  Subsequently, a memorandum from the Lawrence-County Planning Commission to the Board of County Commissioners was drafted providing the four conditions suggested by Rural.  The letter provided:

1.     Undeveloped properties in the enlargement area and within the 3-mile planning boundaries of Lawrence, Eudora and Baldwin must be platted before receiving new water meters or service lines from RWD #4.

2.     RWD #4 waives their statutory right to compensation for infrastructure and meters located on lands within the "island annexations" and annexed by the City that meet <u>all</u> of the following conditions:

a      The lands are within the 3-mile planning boundary of an incorporated city of Douglas County;

b.     Properties **<u>not</u>** provided water service by RWD #4 as of date of the district service area adjustment; and

c.     Meters and/or other infrastructure are not reusable by the City upon annexation.

3.     RWD #4 will not waive compensation rights for any properties currently receiving service from RWD #4, regardless of the property's location within or outside the 3-mile planning boundary of any incorporated city.

4.     RWD #4 and the City will negotiate a fair market price for

---

[39](Doc. 152-22.)

[40]*Id.*

compensation to be paid to RWD #4 for meters and/or other infrastructure that is reusable by the City when upon annexation.[41]

On November 23, 2004, the Board of Commissioners met and agreed to conditions 2, 3, and 4.[42] An order was drafted and signed, granting certain properties in Douglas and Johnson County to the district subject to the three conditions.  The order provided that the conditions only applied "to the tracts contained in the said Exhibit A [attached to the order], and shall not apply to any land presently in Rural Water District No.4."[43]

While planning the Johnson 6 project, Rural obtained $1.25 million in financing from the KDHE revolving loan fund at a fixed interest rate over 20 years.[44]  Instead of pursuing the entire loan from KDHE, however, Rural decided to obtain a portion of the loan from a local bank and then enter into a guaranty from the federal government.[45]  On June 15, 2004, Rural entered into a loan agreement with First State Bank and Trust of Lawrence, Kansas, for $250,000, and pledged as collateral all its general intangibles and revenues.[46]  Subsequently, on July 19, 2004, First State Bank and Rural entered into an agreement with the United States, acting through the Consolidated Farm Agency for a loan guaranty, which guaranteed 90% of the $250,000 borrowed from the bank.[47]

---

[41](Doc. 152-24.) (emphasis in original).

[42](Doc. 152-23.)

[43](Doc. 152-25.)

[44](Doc. 152-14.)

[45](Doc. 152-14.)

[46](Doc. 153-4.)

[47](Doc. 153-5.)

The City of Eudora also provides water service within its boundaries and owns and operates water treatment and distribution facilities in Douglas County.  On October 28, 2002, the City annexed the area known as Shadow Ridge;[48] on September 11, 2006, the City annexed the Fairfield addition also known as the Garber Property;[49] on October 9, 2006, the City annexed the area know as the Meadow Lark Property, which includes JRB, Inc., New Streams, LLC, ClearStreams Holding, LLC, and ClearWater, LLC;[50] on October 23, 2006, the City annexed the Grinnell Property; and on December 11, 2006, the City annexed the area known as Lot I, Kurtz Addition.[51]

After the City annexed the properties, Rural contacted Doug Garber on May 25, 2007, to determine what water requirements were needed to support his development.[52]  The letter advised Garber that Rural had the exclusive right to provide water to his property.  Subsequently, a contractor employed by a subdivision developer, contacted Rural to request the District locate and mark its water lines on the east side of Douglas County Road 1061 so that it could extend water to the east side after it connects pipes to the City's water main.  In a letter dated August 3, 2007, Rural told the City that providing water to the Garber Property would violate its right under § 1926(b).[53]  On August 15, 2007, the City sent a letter to representatives of the Garber Property, explaining that Rural had "threatened to bring suit against the City if the City allows

---

[48](Doc. 152-31.)

[49](Doc. 153-9.)

[50](Doc. 153-8.)

[51](Doc. 153-7.)

[52](Doc. 153-14.)

[53](Doc. 153-17.)

your client to make a connection to the City water system."[54]  The letter also advised Garber of his ability to petition Rural to be released from the district.  On August 29, 2007, Rural sent a letter to Garber, apparently because of correspondence it received from Garber, discussing the process of providing water and providing contact information for its engineer, James Challis. The letter stated that in order to provide service, a check for $600.00 was required to pay for the engineering services and infrastructure study.[55]  Service was never connected to the Garber Property, and on September 12, 2007, Rural's pricing guidelines changed to accommodate on-site and off-site expenses.

On September 14, 2007, Rural sent another letter to Garber, this time detailing the engineer's analysis of providing water service.  The letter stated that Rural could provide service, including fire service, even though it was not required to do so.  The letter further provided that the total developer cost would be $135,000.[56]  On September 18, 2007, the City sent Rural a letter pursuant to K.S.A. § 12-527, stating that it had selected an appraiser "to determine the reasonable value of the properties, facilities, and improvements of Rural Water District No. 4."  The letter stated that "[i]f the District intends to comply with K.S.A. § 12-527, I would ask that you name your appraiser on or before October 1, 2007.  If the District has not done so by that time, I will assume the District does not intend to comply with K.S.A. § 12-527 and proceed to file the appropriate pleadings to compel the District's compliance."[57]

---

[54](Doc. 153-16.)

[55](Doc. 153-15.)

[56]*Id.*

[57](Doc. 153-11.)

On September 20, 2007, after receiving a voice message from Catherine Theisen, Garber's attorney, the City sent Garber a letter indicating that it knew that Garber intended to obtain water from Rural, but that the City was still willing to work with Garber on providing water service.  Attached to the letter was correspondence between Rural and the City, which the City indicated "may impact your client's decision on water service."[58]  Again on September 20, 2007, the City sent a letter to Rural indicating that it is aware of Rural's plans to expand its area within the City of Eudora.[59]  On September 27, 2007, this action was filed.  The City has never provided water service to the Garber Property, and currently that property is without water service from either the City or Rural.

## V.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[60]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[61]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[62]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[63]

---

[58](Doc. 153-19.)

[59](Doc. 153-12.)

[60]Fed. R. Civ. P. 56(c).

[61]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[62]*Id.*

[63]*Id.* at 251–52.

28

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[64]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[65]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[66]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[67]  If the moving party bears the burden of proof at trial, "it must point to evidence in the record that supports its version of all material facts and demonstrate an absence of a genuine issue of material facts."[68]  "If the moving party does not meet this burden, the court must deny summary judgment even if the nonmoving party does not produce any opposing evidence."[69]  If the moving party does meet its burden, the nonmoving party must offer more than mere allegations and denials to create a genuine issue of material fact.[70]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[71]  Furthermore, the record is to be viewed in the light most favorable to the nonmoving party

---

[64]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[65]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[66]*Id.*

[67]*Id.*

[68]*Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting).

[69]*Id.*

[70]*Id.*

[71]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

## VI.    DISCUSSION

To receive protection under § 1926(b), a water association must show that it has a continuing indebtedness to the federal government and that it provided or made service available to the disputed service area.[72]  The City attacks Rural's alleged right under § 1926(b) on all fronts, first claiming that Rural did not have the authority of the state to enter into the loan guaranty agreement with the federal government.  The City further argues that if Rural had authority to enter the agreement, it does not pass the first part of the test under § 1926(b)—that is, it does not have a continued indebtedness to the federal government.  Further, even if Rural can show that it is indebted to the federal government, it cannot show that it provided or made "service available."  Alternatively, if Rural is protected by § 1926(b), there is no evidence that the City has "limited or curtailed" Rural's right.

A.    *Did Rural Have Authority: Was the Loan Guaranty Agreement Necessary Under Kansas Law*

The City argues that Rural cannot show that the City violated its statutory right under § 1926(b) because Rural had no such right.  The parties agree that Rural, as a municipal corporation, is a creature of statute and has only those powers given by law or necessarily implied to give effect to its powers specifically granted.[73]  The law is sufficiently clear that persons contracting with a municipal corporation must ascertain the municipal's authority to contract or suffer the consequences.[74]  Any attempt to enter into a contract with a municipal

---

[72]*Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1197 (10th Cir. 1999).

[73]*Wiggins v. Hous. Auth. of Kansas City*, 916 P.2d 718, 720 (Kan. Ct. App. 1996) (citing *Weil & Assoc. v. Urban Renewal Agency*, 479 P.2d 875, 885 (Kan. 1971)).

[74]*Id.* (citing *Blevins v. Bd. of County Comm'rs*, 834 P.2d 1344, 1351 (Kan. 1992)).

corporation that acts outside its authority will be considered void under state law,[75] and any reasonable doubt as to the existence of a particular power is resolved against its existence.[76]

The issue presented is whether the loan guaranty was necessary to carry out the purposes of the organization.  The authority extended to Rural did not include the power to enter into agreements that are not necessary for carrying out its purpose.  The City argues that Rural obtained the loan guaranty solely to obtain protection under § 1926(b), which does not render the loan guaranty necessary, and thus Rural lacked authority to obtain the loan guaranty.

Under K.S.A. § 82a-619, a water district has the power to:

> (c) contract; . . . (e) construct, install, maintain and operate such ponds, reservoirs, pipelines, wells, check dams, pumping installations or other facilities for the storage, transportation or utilization of water and such appurtenant structures and equipment necessary to carry out the purposes of its organization; . . . (g) *cooperate with and enter into agreements with the secretary of the United States department of agriculture or the secretary's duly authorized representative necessary to carry out the purposes of its organization*; and to accept financial or other aid which the secretary of the United States department of agriculture is empowered to give pursuant to 16 U.S.C.A., secs. 590r, 590s, 590x-1, 590x-a and 590x-3, and amendments thereto; (h) acquire loans for the financing of up to 95% of the cost of the construction or purchase of any project or projects necessary to carry out the purposes for which such district was organized . . . .[77]

Determining what is necessary under the statute is an issue of first impression.  The Court has not found any Kansas cases dealing with the issue.[78]  As the power of Rural to enter into

---

[75]*Id.* (citing *Blevins*, 834 P.2d at 1352).

[76]*Id.* (citing *Wichita Pub. Sch. Employees Union v. Smith*, 397 P.2d 357, (Kan. 1964)).

[77]K.S.A. § 82a-619 (emphasis added).

[78]The Court is obligated to decide state law issues when they are necessary to render a judgment.  *See Kansas Judicial Watch Review*, 519 F.3d at 1119 (quoting *Copier ex rel. Lindsey v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir. 1998)).

agreements with the United States stems from statute, deciphering the meaning of the term "necessary" under the statute is an issue of statutory construction. The fundamental rule of statutory construction is to ascertain the intent of the legislature.[79] When interpreting a statute, the Court must avoid unreasonable results and give effect to the entire statutory scheme if possible.[80] The legislature is presumed to have expressed its intent through the language of the statutory scheme; therefore, when ordinary words are given their ordinary meaning, and the statute is plain and unambiguous, the Court must give effect to the legislature's intent rather than creating its own meaning.[81] "That which is implied in a statute is as much a part of it as that which is expressed. A statutory grant of a power or right carries with it, by implication, everything necessary to carry out the power or right and make it effectual and complete."[82] It is a well settled principle that creatures of statute have powers only as conferred by statute; any reasonable doubt as to the existence of such power should be resolved against its existence.[83]

Before determining what is necessary to carry out the purposes of the organization, the Court must know what the purpose of a water district is. Beginning with the statute, it seems abundantly clear that the purpose of any water district created in the state of Kansas is to "promote the public health, convenience and welfare."[84] Webster's Dictionary defines

---

[79]*In re Goddard*, 180 P.3d 604, 607 (Kan. Ct. App. 2008).

[80]*In re Dir. of Prop. Valuation*, 161 P.3d 755, 761 (Kan. 2007).

[81]*State v. Moffit*, 166 P.3d 435, 438 (Kan. Ct. App. 2007) (citing *State v. McCurry*, 105 P.3d 1247, 1250 (Kan. 2005)).

[82]*State ex rel. Beck v. Bd. of Comm'rs of Allen County*, 57 P.2d 450, 452 (Kan. 1936) (citations omitted).

[83]*Supra* note 76.

[84]K.S.A. § 82a-602(4) (requiring that a petition for organization of a rural water district be "conducive to and will promote the public health, convenience and welfare."); K.S.A. § 82a-614(4) (requiring that a petition for incorporation of a water district be "conducive to and will promote the public health, convenience and welfare.");

"necessary" as an indispensable item; logically unavoidable; absolutely needed.[85]  Black's Law

Dictionary notes that necessary "must be considered in the connection in which it is used, as it is

a word susceptible of various meanings."[86]

The statutory scheme provides some suggestion of the Kansas Legislature's intent.

K.S.A. § 82a-619(g) provides that a water district can enter into agreements with the United

States  where those agreements are necessary for its purposes, and obtain funding pursuant to

former sections 16 U.S.C.A., secs. 590r, 590s, 590x-1, 590x-a and 590x-3.  Those sections

further provided for authorized appropriations, limitations on aid, authorized loans for farms, and

insurance and sale of loans.[87]  Those sections were amended, and later codified in other sections

of the Title 7.  Later, in 1961, Congress enacted § 1926(b).  As the Kansas legislature

contemplated the repealed provisions as potential aid to water districts prior to the creation of §

1926(b), it cannot be said that the legislature intended for water districts to enter into loan

agreements with the federal government solely for § 1926(b) protection even if federal

government's numerous legislative amendments culminated in the enactment of  § 1926(b).[88]

Moreover, any such intent by the Kansas legislature would contravene Congress's intent

in enacting § 1926(b).  One purpose of § 1926 is to permit water districts to create economies of

scale and spread the cost of water among their many residents.  If a water district is authorized to

---

K.S.A. § 82a-616(a)(4) (requiring county board to consider whether petitions are "conducive to and will tend to
promote the public health, convenience and welfare.").

[85]Webster's New Collegiate Dictionary 761 (1973).

[86]Black's Law Dictionary 928 (5th ed. 1979).

[87]*See* 16 U.S.C. § 590r (repealed by Pub. L. 87-128, 75 Stat. 318 (Aug. 8, 1961)).

[88]Nor has Kansas amended § 82a-619(g) to explain from what federal statutes a water district may obtain
financial aid.

obtain a loan merely for attaining protection of its monopoly status,  the attendant costs of repaying the principal and accrued interest on that obligation, is in contravention of the purpose of spreading costs among the residents in order to reduce the overall fees for the residents served by the water district. Obtaining and maintaining an indebtedness solely to secure protection of the district's monopoly status is not a purpose under the federal scheme either, as debt could increase the price paid by each water district resident.

Thus, this Court concludes that entering into an agreement with the federal government solely for § 1926(b) protection is not *necessary* to the purposes of the water district, to promote the public health, convenience and welfare.[89]  As stated above, a statute granting power to do one thing necessarily grants authority to do those things implicit in accomplishing the stated goal. Here, the Court finds that the stated goals of the statute are not accomplished where the loan guaranty is done solely for § 1926(b) protection.  To be sure, monopoly protection in and of itself does nothing for "public health, convenience and welfare;" rather, it seeks only to protect the water district from competition, which in most instances is better for the public health and welfare.  In this instance, the public is not benefitting from lower consumer prices that are inherent in competitive utilities.  Furthermore, unlike other utilities that are regulated by the state and restricted to certain fees, a rural water district, such as this, with monopoly protection is essentially free to price at any rate.[90]

---

[89]Defendant argues for a narrow interpretation of the term "necessary," arguing that § 1926(b) protection was intended for "capital starved rural water associations."  Plaintiff argues that determining if the agreement was necessary requires joining as parties the bank and federal government.  But the question of necessity hinges on the statutory purposes  of the water district, not on any factual issues implicating the other parties to the loan or guaranty. The Court agrees with defendant that determining whether the agreement was necessary does not address the validity of the agreement as between the federal government and the bank. Rather this Court's focus is on whether Rural had the authority to enter into the agreement.

[90]Notwithstanding a challenge by a rate payer.

Given the Court's ruling that a Kansas rural water district cannot enter into an agreement with the federal government solely for § 1926(b) protection, there is a material issue of fact precluding judgment.   The City points to statements from Rural's Administrator Scott Shultz evidencing that Rural obtained the federal guaranty solely to obtain monopoly protection.  In fact, Shultz stated that Rural was able to secure complete financing for the Johnson County Project from KDHE, but decided to pursue the § 1926(b) protection because the KDHE loans do not provide any protection from competition and annexation.  The City argues that Shultz's admission that "the only reason for this loan is the potential for annexation protection" establishes that the agreement was entered for an unnecessary purpose and as a result, outside the powers granted to Rural.

But the evidence is not as conclusive as the City suggests.  Shultz further states in his opinion that § 1926(b) protection would serve the district by preventing the City from annexing lands within Rural's service area and protect Rural's ability to maintain its facilities and water system.  This, Rural argues evidences that it sought the federal loan guaranty not only because § 1926(b) would provide monopoly protection, but that the loan guaranty would also protect Rural's financial integrity.  Viewing the evidence and making all inferences in Rural's favor, there appears to be an issue of material fact as to whether the loan guaranty agreement was entered solely for § 1926(b) monopoly protection.

B.      *Is Rural Water Indebted to the Federal Government*

Even if the reasons for which Rural obtained the loan agreement are necessary for its purposes, argues the City, Rural cannot show that it is indebted to the federal government.  To show that it is protected by § 1926(b), Rural must come forth with evidence that it is indebted to the federal government.  Because the loan guaranty is not a loan from the federal government,

Rural cannot meet the continuing indebtedness test.  Rural maintains that the loan guaranty is

enough under § 1926(b) to satisfy the continued indebtedness prong of § 1926(b).

To obtain protection under § 1926(b), a water district must show that it has a continued

indebtedness to the federal government.  Section 1926(b) provides that "[t]he service provided or

made available through [a water district] shall not be curtailed or limited . . . during the term of

such loan."  The section protects loans made by the federal government and loans insured by the

federal government.  In § 1926(a)(1), the Secretary is authorized to "make or insure loans."  In §

1926(a)(24), the Secretary may guarantee a loan made to finance a community facility . . . ."

Thus, the term "loan" in § 1926(b) refers to loans made and guaranteed by the federal

government.  Here, plaintiff can show that it has a loan guaranteed by the federal government

and defendant concedes such.

C.   *Does § 1926(b) Protection Apply to the Affected Area*?

The City also argues that a Commission Order created conditions on which the City

could annex certain portions of land, and that the Order prevented Rural from obtaining §

1926(b) protection in the area.  The City argues that because the procedure for attachment of

lands to any water district is governed by Kansas law, the Commission could have attached any

condition to Rural's ability to attach additional lands to its boundary.

The City asserts that when Rural petitioned for additional land, the Commission placed

certain conditions on Rural's ability to obtain monopoly protection over lands within its

boundary.  The City argues that the conditions required Rural to cooperate with any annexation

of its territory.  Rural, however, argues that the conditions in question only pertained to four

specific tracts of land, and not to the entire territory.  Rural cites to an order signed by the

Commission stating such.  The City refutes this argument, claiming that the Order signed by the

Commission was drafted solely by Rural's counsel and misrepresented the agreement fostered between the parties at the Commissioner's meeting.

As detailed in the uncontroverted facts section, the City does not show that there was a different order. What the City argues is that plaintiff's counsel surreptitiously inserted the language found at the end of the November 24, 2003 Order to make the conditions only applicable to the four tracts of land in issue in those proceedings. The evidence does not support the City's contention, which it seems to abandon in its reply brief. What the facts do support is that the Order entered provides that any conditions only apply to the four tracts of land Rural sought to add its territory. Accordingly, any provable § 1926(b) protection will surely apply to the areas in issue.[91]

D.      *Standard for "Service Available"*

As stated above, plaintiff must also show that it made service available to the affected area–the area in dispute. However, the parties argue about the standard to apply. The City claims that Rural must show that it had "pipes-in-the-ground," the ability to provide reasonable fire protection, and that it offered services at a reasonable price. Rural objects, asserting that it merely has to pass the "pipes-in-the-ground" test, that any showing of the ability to provide fire protection is irrelevant, and that any showing that prices were unreasonable is the City's burden, as it is an affirmative defense.

In *Sequoyah County Rural Water District No. 7 v. Town of Muldrow*, the Tenth Circuit considered the "pipes-in-the-ground" test, acknowledging that the "test examines whether a water association 'has adequate facilities within or adjacent to the area to provide service to the

---

[91]Additionally, the City argues that § 1926(b) does not apply to lands annexed prior to plaintiff entering the loan guaranty agreement with the federal government. Rural does not object and concedes that the Shadow Ridge property is not protected and is not a part of this suit.

area within a reasonable time after a request for service is made.'"[92]  The court agreed that

merely a legal duty to provide water would not meet the requirement under § 1926(b) that

service be provided or made available; thus, it reasoned that making service available inherently

requires the water district to have the capability of providing water service.[93]  The Tenth Circuit

concluded that to analyze whether service has been made available under § 1926(b), a court

"should focus primarily on whether the water association has *in fact* 'made service available,'

i.e., on whether the association has proximate and adequate 'pipes in the ground' with which it

has served or can serve the disputed customers within a reasonable time."[94]

    In *Rural Water District No. 1 v. City of Wilson (Post Rock )*, the Tenth Circuit repeated

its directive that whether a water district has made service available depends "'primarily on

whether the water association has *in fact* "made service available," i.e., on whether the

association has proximate and adequate "pipes in the ground" with which it has served or can

serve the disputed customers within a reasonable time.'"[95]  The court stated, however, that the

cost of water service was relevant in determining whether a water district made service available

under § 1926(b), noting that even if a water district has passed the "pipes-in-the-ground" test, the

cost of those services may be so excessive that it has not made services 'available' under §

1926(b)."[96]  The point of contention between the parties is based on the court's statement that " *if*

---

[92]191 F.3d 1192, 1202 (10th Cir. 1999) (quoting *Bell Arthur Water Corp. v. Greenville Utils. Comm'n*, 173 F.3d 517, 526 (4th Cir. 1999)).

[93]*Id*. at 1203 (citations omitted).

[94]*Id*. (emphasis in original).  The City does not dispute Rural's right to provide water under Kansas law.

[95]243 F.3d 1263, 1270 (10th Cir. 2001) (quoting *Sequoyah County Rural Water Dist. No. 7*, 191 F.3d at 1203).

[96]*Id.* at 1271.

*the city can show* that Post Rock's rates or assessments were unreasonable, excessive, and confiscatory, then the water district has not made services available under § 1926(b)."[97]

Rural argues that this language places the burden squarely on the City to show that the prices offered by Rural rendered service unavailable.  In effect, Rural argues that the court created an affirmative defense, which the City failed to plead and failed to muster evidence on summary judgment.  Of course, the City claims that the language did not create an affirmative defense, but created additional burdens for a water district to prove that it made services available under § 1926(b).

The *Post Rock* test requires determining "(1) whether the challenged practice allows the district to yield more than a fair profit; (2) whether the practice establishes a rate that is disproportionate to the services rendered; (3) whether other, similarly situated districts do not follow the practice; (4) whether the practice establishes an arbitrary classification between various users."[98]  Relying on the language in *Post Rock* and *Shawnee Hills Mobile Homes, Inc. v. Rural Water District No. 6,*[99] Rural argues that the City bears the burden to show that prices were so unreasonable as to make service unavailable.  In *Shawnee Hills*, the Kansas Supreme Court stated that water rates set by a municipality are presumed to be valid and reasonable until the contrary has been established, and the burden of overcoming this presumption rests upon the "challenging party."[100]  The City acknowledges this directive, but asserts that a state law cannot change the burden implicit in a federal statute.  Moreover, the City argues that only an *en banc*

---

[97]*Id.* (emphasis added).

[98]*Id.*

[99]537 P.2d 210 (Kan. 1975).

[100]*Id.* at 217.

court can overturn prior precedent of the circuit, such that *Post Rock* did not and could not have changed the burden in the service available test.

The City is correct that the Kansas Supreme Court cannot shift the burden implicit in a federal statute.  But the City wrongly assumed that the burden of proof of showing that rates were unreasonable, excessive, and confiscatory was previously placed on the water utility.  Here, where showing that rates are reasonable and nonconfiscatory is not a burden implicit in § 1926(b), there is no inconsistency or change in the rule of law in requiring the City to prove the *Post Rock* test.  The *Post Rock* case explicitly placed the burden on the city on remand.[101]  The court relied on Kansas law to conclude that determining the reasonableness of rates was relevant in determining whether a water district had made service available.[102]  Its reliance on those cases could only lead this Court to believe the Tenth Circuit knew that it would be the City's burden, as those cases were styled as a plaintiff bringing a claim that the rates charged were too high as to be unreasonable, excessive, and confiscatory.[103]  In those cases, the Kansas Supreme Court stated that rate making was an administrative event and there is a strong presumption that the rates charged are correct.[104]  The party claiming that rates were unreasonable was saddled with the burden.  This Court sees no difference where the party in the case is the defendant, but still the party bringing the claim.  It seems clear that the burden would rest with the "challenging party" as the Kansas Supreme Court stated in *Shawnee Hills*.[105]  The Court cannot find that Rural

---

[101]*Post Rock*, 243 F.3d at 1272.

[102]*Id.* at 1271.

[103]*See Shawnee Hills Mobile Homes, Inc.*, 537 P.2d 210; *Bodine v. Osage Rural Water Dist. No. 7*, 949 P.2d 1104 (Kan. 1997).

[104]*See Shawnee Hills Mobile Homes, Inc.*, 537 P.2d at 217; *Bodine*, 949 P.2d at 1110.

[105]*Shawnee Hills Mobile Homes, Inc.*, 537 P.2d at 217.

bears the burden of producing evidence that its rates were reasonable.

Rural argues that because it is the City's burden to show that rates were unreasonable, and because the reasonableness of rates is an affirmative defense, the Court should prevent the City from producing evidence on the issue.  Without deciding whether the City's burden should be styled as an affirmative defense, the Court will permit the City to produce evidence of the sort.  While the "affirmative defense" was not raised in the Pretrial Order, the Court notes that in the Pretrial Order under defendant's contentions, the City does state that Rural tried to change the "confiscatory pricing structure which existed at the time of annexations . . . ."[106] Additionally, even if the Court were to consider whether there is any prejudice to Rural, it would find none, as both parties have extensively briefed the issue and Rural is prepared, more so than the City it argues, to present evidence on the reasonableness of its rates.  Accordingly, the Court will permit the City to provide evidence that the rates charged by Rural are so unreasonable, excessive, and confiscatory that Rural did not make water available.  The evidence will be considered based on the "totality of the circumstances."[107]

Next, the City claims that Rural must also show that it had "sufficient capacity to provide reasonable fire protection to the extent practicable."[108]  According to the City, although most cases even touching on this issue have ruled that a water district's ability to provide fire services is irrelevant to whether it is protected under § 1926(b), it is a part of Rural's burden to show that it could provide "reasonable" fire protection if  "practicable" in order to show that it made service available.

---

[106](Doc. 219, 15.)

[107]*Rural Water Dist. No. 1 v. City of Wilson*, 211 F. Supp. 2d 1324, 1332 (D. Kan. 2002).

[108]7 C.F.R. § 1780.57(d).

41

One of the first cases touching on the issue of fire protection in the context of § 1926(b) is *Rural Water District No. 3 v. Owasso Utilities Authority*,[109] where the court stated in passing that there was "nothing in the [Agricultural Act of 1961] to preclude the Owasso Utilities Authority from maintaining a water line for the purposes of fire protection only."[110]  Later in 1998, the Northern District Court for the District of Ohio ruled that § 1926(b) was not enacted to provide fire protection, it was enacted to provide a means for securing adequate running household water.[111]  In *Sequoyah County Rural Water District No. 7*, the Tenth Circuit, while noting that the current pipes in the ground could not support fire protection, mentioned the law stated above.[112]  Finally, in *Post Rock*, the court stated that "[a]lthough the City planned to run water pipes into [a part of the water district's territory] for fire protection, this was a permissible action that did not encroach on Post Rock's service rights."[113]

The City's reliance on 7 C.F.R § 1780.57(d) for the proposition that fire protection is a part of the test is misplaced.  That section states: "Water facilities should have sufficient capacity to provide reasonable fire protection to the extent practicable."  First, as noted by Rural, the regulation does not employ language leading the Court to conclude that this change in the regulation was intended to be a part of the made service available test under § 1926(b).  The use of the word "practicable" implies that at some point, the water district's capacity to provide fire

---

[109]530 F. Supp. 818 (N.D. Okla. 1979).

[110]*Id.* at 823.

[111]*Rural Water Sys. No. 1 v. City of Sioux Ctr, Iowa*, 29 F. Supp. 2d 975, 993 (N.D. Ohio 1998) (*rev'd on other grounds*).

[112]*Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1204 n.10 (10th Cir. 1999).

[113]*Rural Water Dist. No. 1 v. City of Wilson*, 243 F.3d 1263, 1272 (10th Cir. 2001).

protection becomes impracticable.  Reading the regulation to provide fire protection under §

1926(b) would effectively limit the made water available test under § 1926(b), as when it

becomes impracticable to provide fire protection, a water district could no longer meet the made

service available test even if it had pipes in the ground to provide potable water service.  If that

were the case, the regulation need not say provide "fire protection to the extent practicable;" it

would simple state that fire protection is required under § 1926(b).[114]  Moreover, as Rural points

out, if this regulation was intended to inform water districts of the requisites to qualify for loans

under the Agricultural Act, it would be placed in 7 C.F.R. § 1942.17, the regulation informing

water districts of the guidelines for obtaining federal aid.

So too is the City's reliance on *Rural Water District No. 3 v. Owasso Public Works

Authority (Owasso II)*[115] misplaced, as that case did not decide the issue of fire protection; rather,

it decided that an injunction levied in 1979 could no longer stand.  Although the court mentioned

that a rural water district could not "escape fire protection when attempting to establish §

1926(b) protection" based on 7 C.F.R. § 1780.57(d),[116] that regulation appears to provide a

limited requirement for fire protection.  In essence, like other courts that have reviewed this

issue, this Court concludes that fire protection is not a part of the analysis under § 1926(b), as the

purpose of § 1926(b) is "to provide means of securing a 'safe and adequate supply of running

household water.'"[117]

---

[114]This reasoning also follows state law requiring fire protection.  K.S.A. § 80-1513.

[115]475 F. Supp. 2d 1108 (N.D. Okla. 2007).

[116]*Id.* at 1111.

[117]*Sequoyah County Rural Water Dist. No. 7*, 191 F.3d at 1204 n.10 (quoting *Rural Water Dist. No. 3 v. Owasso Util. Auth.*, 530 F. Supp. 818, 823 (N.D. Okla. 1979)).

E.      *Did Rural Make Service Available?*

As detailed above, Rural must provide evidence on which a reasonable jury could conclude that it had "made service available" upon request.  Any material issue of fact on the issue of whether Rural made service available precludes the entry of summary judgment.  The City claims that at the time of annexation, the price for water services was so high that Rural effectively did not make water available.  Rural states that the price for service should not be determined at the time of annexation, but at the time the property owner makes a request for service.  Therefore, the price structure in place prior to September 12, 2007, is not applicable because at that time, no request for service had been made.

Rural is correct.  In *Post Rock*, the court stated that whether a water association has made service available is measured at the point a request for those services has been made.[118]  Indeed, the City explicitly quotes the applicable rule from *Rural Water Dist. No. 1 v. City of Wilson* as requiring a water district to have "'adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made."[119]  Therefore, any argument as to applicable price range for services depends on when a request for services was made.  Here, the evidence demonstrates that there is an issue of fact as to whether Mr. Garber officially made a request for service.

The City offers evidence of Rural's pricing prior to September 12, 2007, arguing that these prices show that the cost of water service was unreasonable, excessive, and confiscatory.  According to the City, when the property was annexed, Rural's prices were so high and

---

[118]*Post Rock*, 243 F.3d at 1270.

[119](Doc. 188 at 14.)

44

excessive, as compared to the City's prices, that it effectively could not make water available to the Garber Property.  But Shultz testified that Garber would have paid "nothing" for the service because, as Challis concluded, Rural had the pipes in the ground and was capable of providing water.  Moreover, the up-front costs associated with providing the water service would have been reimbursed over time with the addition of new residents in the area of the Garber Property.  Specifically, Shultz testified that Rural would charge Garber 8% of the approximate cost of $10,000.00, and Rural would pay the remaining 93% of cost and would reimburse the 8% cost to Garber as the other developments requested service.

In addition, the City claims that the 2 ½ inch main is inadequate to provide adequate water service to the Garber Property.  The City offers the expert testimony of Kingsley, to contradict Challis' testimony that the 2 ½ inch main meets the requirements of the KDHE or AWWA.  According to the City's expert, although Rural has a water main near the property, that main would not have the capacity to provide adequate water service to meet the Garber Property requirements. This contention is rebutted by Rural's expert Challis, who opines that the 2 ½ inch main is adequate to providing services.  Based on these differing expert opinions, an issue of material fact remains for trial.

F.    *Has the City Curtailed or Limited Rural's Ability to Serve its Protected Area?*

The City argues that Rural cannot sustain its burden on summary judgment of showing that it suffered deprivation of a right under the constitution or federal laws.  Specifically, the City argues that Rural cannot show, for purposes of 42 U.S.C. § 1983, that it suffered any curtailment or limitation of its right under § 1926(b).  The City argues that annexation alone is not enough to curtail and that Rural has not come forth with any evidence tending to show that its right under § 1926(b) was curtailed or limited.  The City argues that allegations of threats and proposed taking

45

of Rural assets pursuant to K.S.A. § 12-527 are not enough to curtail or limit Rural's ability to provide service.

Rural asserts that the City has curtailed or limited its ability to provide water service to its protected service area, or alternatively, there is ample evidence in the record for a reasonable jury to so conclude. Rural claims that not only did the City threaten property owners with de-annexation, it threatened Rural with K.S.A. § 12-527, utilizing the statute as a mandatory tool to obtain Rural's assets. Rural argues that these facts together tend to show that the City sought to obtain and was intent on obtaining its assets.

The crux of this argument hinges on interpretation of § 12-527.[120] Rural claims that §

---

[120] (a) Whenever a city annexes land located within a rural water district organized pursuant to the provisions of K.S.A. 82a-612 *et seq.*, and amendments thereto, the city shall negotiate with the district to acquire title to all facilities owned by the water district and used for the transportation or utilization of water distribution to the water district benefit units within the area annexed by the city. Title shall vest in or become the property of the city upon payment by the city to the water district of the reasonable value of such property, as agreed upon by the governing body of the city and the board of directors of the district. If the district is unable to reach agreement with the city on the reasonable value for such facilities, then the reasonable value shall be determined in the following manner:

(1) The district and the city shall each select one qualified appraiser and the two appraisers so selected shall then select a third appraiser for the purpose of conducting appraisals so as to determine reasonable value of the property, facilities and improvements of the district annexed by the city.

(2) The agreement or decision of at least two of the three appraisers shall be the fair market value presented to the city for payment and the district for acceptance.

(3) If either the district or the city is dissatisfied with the decision of the appraisers, then the district or the city may institute an action in the district court to challenge the reasonableness of the value determined by the appraisers.

(b) The compensation required by this section shall be paid to the district whether or not the city actually utilizes the facilities of the district for the delivery of water to property within the city and shall be paid at a time not later than 120 days following the date upon which the fair market value of the facilities are certified to the city and to the district, or at such later date as may be mutually agreed upon by the city and the water district or as may be determined by the district court. The city, as part of its service extension plan required under the provisions of K.S.A. 12-520b and 12- 521c, and amendments thereto, shall notify each affected rural water district of its future plans for the delivery of water in areas proposed for annexation currently being served by the district.

(c) The governing body of the city and board of directors of the district may provide, on such terms as may be agreed upon, that water transmission facilities owned by the district and located within the city may be retained by the district for the purpose of transporting water to benefit units outside the city.

(d) Except for nonpayment of bills, the district shall not diminish service to benefit units who were supplied water by

12-527 is a mandatory statute that is utilized after annexation to obtain the assets of a water district.  The City claims that § 12-527 is not mandatory, but directive, and simply invoking the section does not result in curtailment or limitation of Rural's service territory.

Section § 12-527 states in part, that:

> Whenever a city annexes land located within a rural water district organized pursuant to the provisions of K.S.A. 82a-612 *et seq.*, and amendments thereto, the city shall negotiate with the district to acquire title to all facilities owned by the water district and used for the transportation or utilization of water distribution to the water district benefit units within the area annexed by the city.

The issue is whether this statute is mandatory or directory.  There are no Kansas cases deciding this issue.  The Court again applies the tenets of statutory construction.

Rural argues that the statute is unambiguously mandatory; the statute uses the term "shall" eleven times.  Under Kansas law, however, the term "shall" is sometimes translated as "may," depending on the context of the statute.[121]  Indeed, this statute on its face is somewhat ambiguous as to its directory or mandatory nature.  While § 12-527(a) provides that a city "shall negotiate with the district to acquire title to all facilities owned by the water district," § 12-527(c) states that the city and the water district "may" agree on terms that would leave the water district with its assets.  Making matters more confusing, the statute also provides in § 12-527(b) that "compensation shall be paid to the district whether or not the city actually utilizes the facilities of the district . . . and shall be paid at a time not later than 120 days following the date

the district at the time of annexation during the period of negotiations conducted pursuant to this section.

(e) Nothing in this section shall be construed as limiting in any manner the authority of a city to select water service suppliers to areas within the city limits, or to limit in any manner the authority of a city to adopt and enforce regulations for the operation of a water service supplier, including but not limited to standards of water quality, classification of water customers, capacity of water system, water system connections to sanitary sewer systems, rates and billing practices and other regulations for protection of the public health, safety and welfare.

[121]*Paul v. Manhattan*, 511 P.2d 244, 248 (Kan. 1973).

on which the fair market value of the facilities are determined."  A reading of section (b) in conjunction with section (a) could lead one to believe that the statute is mandatory, as a city is required to pay for facilities after acquiring title even if it does not intend to use those facilities.

The ambiguity in the statute is revealed by two Attorney General opinions, separately cited to by Rural and the City.  Attorney General Opinion No. 93-47 states that the statute is not mandatory if the city and the district agree that title remain with the district.[122]  In contrast, Attorney General Opinion No. 85-166 provides "it is clear that water lines and facilities are ultimately to be purchased by the annexing city."[123]

In *Paul v. Manhattan*,[124] the Kansas Supreme Court provides some guidance on determining the mandatory nature of a statute, noting that:

> it is a general rule that where strict compliance with the provision is essential to the preservation of the rights of parties affected and to the validity of the proceeding, the provision is mandatory, but where the provision fixes a made [sic] of proceeding and time within which an official act is to be done and is intended to secure order, system and dispatch of the public business, the provision is directory.[125]

In *Wilcox v. Billings*,[126] the Kansas Supreme Court further stated that "[c]onsideration must be given to the entire statute, its nature, its object, and the consequences which would result from construing it one way or the other."[127]  Additional consideration should also be given to whether

---

[122]47 Op. Att'y Gen. (1993).

[123]85 Op. Att'y Gen. (1985).

[124] 511 P.2d 244, 248 (Kan. 1973).

[125]*Id.*

[126]438 P.2d 108 (Kan. 1968).

[127]*Id.* at 111.

48

the statute has consequences for non-compliance.[128]

   In this instance, this Court concludes that the statute is directory in nature.  Analyzing a statutory text[129] in *Bell v. City of Topeka*,[130] the Kansas Supreme Court determined that the statute at issue was mandatory.  The court reasoned that in the context of that statute and consistent with the legislature's intent,  the term "shall" was not used to "direct a mode of proceeding and to secure order and dispatch, but rather to declare specifically how assessments shall be taxed."[131]

   Similarly, § 12-527 is a mode of proceeding statute, instructing the city on its actions after annexation.[132]  Additionally, if read as a mandatory statute, there would be inconsistency within the text itself.  As stated above, section (a) would seem to require a city to acquire a water district's assets after annexation, while section (c) would seem to suggest that obtaining the assets is discretionary because it grants the city the authority to agree to leave the property within the district's control.  As the term "shall" may be construed as "may" when the context demands, reading the statute to make both provisions have effect would require a directory view, as the City may conduct itself in line with section (a) or section (c).

   As further support, the statute does not provide an avenue for non-compliance.  On the

---

[128]*Paul*, 511 P.2d at 249.

[129]The critical terms analyzed in *Bell* were "the remaining cost shall be assessed against the adjacent real property, without regard to the value of the improvements, to the middle of the block on either side."  K.S.A. § 13-10,1115.

[130]553 P.2d 331 (Kan. 1976).

[131]*Id*. at 338.

[132]The statute does not provide for annexation, but does establish a means for establishing how value is determined, how resolution of the value is to be determined, and other means of agreement between the city and the district.  *See* K.S.A. § 12-527.

face of the statute, a city is not rendered liable if it decides not to follow the directions of the statute.  Indeed, it appears that the statute anticipates this by explaining that the parties can simply agree to have the district retain the assets.  Finally, it is hard to fathom that the Kansas Legislature would draft this statute as a mandatory provision when it undoubtedly knew that making it so would conflict with a water district's right under § 1926(b).[133]

Deciding that the statute is directory, however, does not resolve the issue before the Court.  Rural's argument is not that the City has taken its customers or that the City has supplied water to its service area, but that by threatening Garber with de-annexation, and threatening to enforce the provisions of § 12-527, the City has effectively curtailed or limited Rural's ability to provide water to the Garber Property.  The City argues that as a matter of law, these allegations do not rise to curtailment or limitation under § 1926(b).  It does not, however, provide the Court with any real analysis on exactly what actions are considered curtailment under § 1926(b).

Thus, the issues is whether under § 1926(b), preventing a water district from providing water service to a customer in the protected area is curtailment or limitation under the statute. The Court has no hesitation concluding that it is.

Section 1926(b) states:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

---

[133] 7 U.S.C. § 1926(b) was first drafted in 1961 and K.S.A. § 12-527 was drafted in 1968.  Both provisions have been amended a number of times since promulgation.

When deciphering the terms of the statute, courts have stated that § 1926(b) should be construed liberally to protect water districts from municipal encroachment.[134]  Though the language of the statute does not facially protect against the type of encroachment alleged, keeping a city from effectively preventing a water association from providing service to a property within its service area promotes the purposes of the statute, which are to protect the territory served by a water district from competitive facilities and to protect the United States' financial interest by preventing reduction of a water district's revenue base.[135]  Indeed, the Tenth Circuit has explained that § 1926(b) indicates Congress's mandate that municipalities not encroach on a water district's ability to provide service either through "'competing franchises, new or additional permit requirements, or *similar means*.'"[136]  In this case, the City's alleged maneuvering in preventing Rural from providing water to the Garber Property could actually be considered curtailment or limitation of Rural's alleged right under § 1926(b).

Taking all the evidence propounded on summary judgment, and viewing that evidence in the light most favorable to Rural, a reasonable jury could conclude that the City has effectively curtailed or limited Rural's right under § 1926(b).  Summary judgment is denied as to Rural's § 1983 claim.

## VII.  DECLARATORY AND INJUNCTIVE RELIEF

Both parties also move for judgment as to Rural's declaratory and injunctive relief

---

[134]*Pittsburg County Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 715 (10th Cir. 2004) (citing *N. Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 915 (5th Cir. 1996)); *Wayne v. Vill. of Sebring*, 36 F.3d 517, 527 (6th Cir. 1994).

[135]*Pittsburg County*, 358 F.3d at 715 (citations omitted).

[136]*Glenpool Util. Servs. Auth. v. Creek County Rural Water Dist. No. 2*, 861 F.2d 1211, 1214 (10th Cir. 1988) (quoting *City of Madison, Miss. v. Bear Creek Water Ass'n, Inc.*, 8116 F.2d 1057, 1059 (5th Cir. 1987)).

claims.  As examined in detail above, there remain material issues of fact for trial.  Judgment as to each parties' claim for declaratory and injunctive relief is denied.

## VIII.   THE CITY'S AFFIRMATIVE DEFENSES

Rural moves for judgment on the City's affirmative defenses.  Rural argues that the City's estoppel and statute of limitations defenses are inapplicable because the action was filed within the two year period, and that the other defenses have no basis in law or fact.

A.     *Equitable Estoppel*

Rural argues that the City's affirmative defense of estoppel is inapplicable since it cannot be used to prevent Rural from asserting its right under § 1926(b) because that statute promotes the public interest.  The City concedes that estoppel cannot afford relief to a claim that Rural is entitled to § 1926(b) protection, but argues that it can be used to block any claim of a § 1926(b) violation.

In *Jennings Water, Inc. v. City of North Vernon, Indiana*, the Seventh Circuit reiterated the Supreme Court's mandate that "in suits between private parties, traditional equitable estoppel may not be available when the plaintiff's cause of action is based on a federal statute."[137]  In the end, the Court reasoned that because the purposes of § 1926(b) were to protect the public, equitable estoppel was not a defense applicable to a claim under § 1926(b).[138]  The distinction the City tries to make is that although § 1926(b) claim can not be blocked by equitable estoppel altogether, it should work here to at least prevent Rural from claiming that the actions it induced the City to make violate § 1926(b).

---

[137]895 F.2d 311, 317 (7th Cir. 1989) (citing *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 257 (1945)).

[138]*Jennings Water, Inc.*, 895 F.2d at 317.

Like *Jennings*, the Court believes that the City's argument is misplaced.  The argument is essentially the same as using equitable estoppel to prevent the application of § 1926(b) where Rural cannot rely on such evidence to prove its case.  Furthermore, even if the Court were to view the evidence the way the City suggests, it still would not be able to show equitable estoppel because it cannot show actual or reasonable reliance.  The City knew about Rural's obligation under § 1926(b) and was warned by Rural in letters detailing its alleged right under § 1926(b).  Rural's motion for judgment as to the City's equitable estoppel claim is granted.

        B.     *Statute of Limitations*

The limitations period to bring actions under § 1926(b) is the forum state statute of limitations, which is two years in Kansas.[139]  The City argues that because the action was filed on September 27, 2007, any lands annexed before September 27, 2005, cannot the basis of any claim because the statute of limitations period has elapsed.  Because there are no tracts of property annexed before September 27, 2005,  Rural's motion is denied as moot.

## IX.    MOTION TO DISMISS PLAINTIFF'S SUPPLEMENT COMPLAINT (Doc. 226)

  The City moves to dismiss Rural's supplement to complaint alleging that the City has curtailed or limited its ability to provide service to the Church Property.  In its supplement, Rural alleges that the City annexed the Church Property during the pendency of this litigation and that because of annexation, Rural has lost its ability to serve the Church Property.  The City moves for dismissal arguing that Rural does not have the legal right to serve the Church Property or, alternatively, that the parties agreed that the City would serve the Church Property.

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court assumes the

---

[139]*Pittsburg County Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 712 (10th Cir. 2004).

truth of all well pleaded facts and views all reasonable inferences from those facts in favor of the plaintiff.[140]  A claim will be dismissed for failure to state a claim only when the factual allegations fail to state a claim that is plausible on its face.[141]  Thus, a "mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient";[142] the factual allegations in the complaint must raise a right to relief above the speculative level.[143]  Though "Rule 12(b)(6) does not require detailed factual allegations, . . . the complaint must set forth the grounds of plaintiff's entitlement to relief through more than labels, conclusions and a formulaic recitation of the elements of a cause of action."[144]  When determining whether a claim should be dismissed, the Court is mindful that the question is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support those claims.

Under § 1926(b), a water district must show that it is an association, that it is indebted to the federal government, that it has made service available, and that a defendant has curtailed or limited that service.[145]  When determining whether the water district has made service available, the Court must determine if there is a legal right to serve the property, but primarily, whether the

---

[140]*Lindsey v. Bowling*, 557 F. Supp. 2d 1225, 1226 (D. Kan. 2008).

[141]*Culp v. Sifers*, 550 F. Supp. 2d 1276, 1281 (D. Kan. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974 (2007)).

[142]*Rider v. Werholtz*, 548 F. Supp. 2d 1188, 1194 (D. Kan. 2008) (quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).

[143]*Culp*, 550 F. Supp. 2d at 1281(quoting *Twombly*, 127 S.Ct. at 1965).

[144]*Lindsey*, 557 F. Supp. 2d at 1227 (quoting *Twombly*, 127 S.Ct. at 1964).

[145]*Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1197 (10th Cir. 1999).

water district is capable of providing service.[146]  Here, the City argues that Rural does not have a

legal right to serve the Church Property because it is outside of its territorial boundary.  Citing to

K.S.A. § 82a-622, the City argues that Rural must first annex the Church Property before it has a

legal right to serve it.  Rural does not contest that the Church Property is outside its territorial

boundary, but argues that it has the right to serve the property because it is a part of its service

area.

    Again, the Court must decipher the intent of the Kansas Legislature.  K.S.A. § 82a-622

outlines the procedures a water district must take to attach additional lands to its territory.[147]  The

statute does not explicitly address a water district's right to serve water to territory outside its

statutory boundary.  But a further look at the statutory frame work reveals that the City is correct

that a water district only has the legal right under Kansas law to provide service within its

boundaries.

    Section 82a-619 sets forth the powers of a water district.  That section provides, among

other things, that a water district has the power to exercise eminent domain within its boundaries,

and the power to construct, install, maintain, and operate infrastructure, machinery, and

---

[146]*Id.* at 1203.

[147]A petition addressed to the county commissioners may be filed with the county clerk, praying for the attachment, to an existing district, of lands outside the district which can be economically served by the facilities of the district. Said petition for attachment shall be signed by at least fifty percent (50%) of the owners of land within the area or signed on behalf of the owners of land within the area when such petition is accompanied by a request for petitioning signed by at least fifty percent (50%) of the owners of land within the area. The number of owners of land in the area shall be determined by an enumeration of said owners of land, taken from the tax rolls of the county in which lands are located, and verified by one of said landowners or the attorney filing same, duly attached to and made a part of said petition. For purposes of determining the number of owners of land in the area the tax rolls of the county shall be prima facie evidence of title and the name and address of the owners of land within said area. The petition shall (1) define by metes and bounds the boundaries of lands requested to be attached to the district, and shall state (2) the name of the district to which attachment is desired; (3) that such lands are without an adequate water supply; and (4) that attachment to said district will be conducive to and will promote the public health, convenience and welfare.  K.S.A. § 82a-619.

equipment necessary for carrying out its purposes.[148]   The first clue that the Kansas legislature

wanted a water district to only provide service within its boundary is provided in § (a)—the

power of eminent domain within its boundaries.   Rural relies on the facts that the powers section

does not limit the water district to act within its boundary.   To be sure a water district can

maintain infrastructure outside its boundaries to serve its customers within its boundaries.

Indeed, allowing a water district to construct, install, maintain, and operate certain facilities

outside its district may be necessary.   Water districts may obtain their source of water outside of

the district area, where there is not an abundance of water.   The ability to act outside its

boundaries may be critical in obtaining water for customers inside its boundaries, but this does

not endow the water district with the ability to provide service outside of its boundaries.

Furthermore, K.S.A. § 82a-622, provides for annexation of property to the water district.

By outlining a procedure for expansion, the Kansas legislature must have implicitly recognized

that a water district is limited to providing water within its boundary.   If that were not the case,

there would be no need for a procedure for attachment of additional property, as the water

district could just serve whatever area it was otherwise capable of serving.   This would effect the

unintended consequence of a water district eliminating other providers from serving in areas,

simply because the water district has facilities there to gain access to water.   Moreover, the

notion that a water district has a legal right to provides service outside of its boundary belies  §

82a-602a.   That statute states that:

> Any land located within an improvement district created pursuant
> to K.S.A. 19-2753 *et seq.*, and amendments thereto, or any land
> located within an industrial district created pursuant to K.S.A.
> 19-3801 *et seq.*, and amendments thereto, shall not be included

---

[148]K.S.A. § 82a-619(a) & (e).

> within the boundaries of any rural water district created pursuant to
> K.S.A. 82a-601 *et seq.*, and amendments thereto, unless the
> governing body of such improvement district or industrial district
> approves the inclusion thereof.[149]

By requiring approval for inclusion of an industrial or improvement district, the Kansas legislature recognized that in some instances, there may be a conflict of interest between the purposes of a rural water district and the other districts permitted under Kansas law.  If a water district could serve those districts without inclusion within its boundaries, there could be a potential conflict in completing the industrial district's or improvement district's purposes.  For instance, an improvement district has the power to "[p]lan and construct or purchase public works and improvements necessary for public health, recreation, convenience or welfare within the limits of the improvement district."[150]  If a water district could simply obtain § 1926(b) protection over an improvement district because it otherwise met the standards under § 1926(b), it could prevent another municipality from providing service that could better service the area or even prevent the improvement district itself from obtaining necessary improvements to required to further its purpose because those necessary requirements may curtail or limit a water district's right under § 1926(b).

As Rural admits that the Church Property is not within its boundaries, it cannot show that it has a legal right under Kansas law to service the area.  Accordingly, it has failed to state a claim that withstands Fed. R. Civ. P. 12(b)(6).  The City's motion is granted.[151]

## X.     MOTION TO COMPEL (Doc. 228)

---

[149]K.S.A § 82a-602a.

[150]K.S.A. § 19-2765(d).

[151]The Court does not address the City's remaining contention because (1) it is moot based on the decision above, and (2) any resolution of that issue would require summary judgment briefing.

The City moves to compel Rural to provide all unredacted administrative reports and all administrative reports produced at public meetings.  The City claims that Rural's alleged attorney-client privilege was waived when the reports were attached to meeting minutes at a public meeting.  Alternatively, the City seeks an in camera review of the documents to assure that they are truly privileged.

In Magistrate Judge Waxse's order of December 12, 2008, the Court ordered Rural to produce a privilege log with (1) a description of the redacted information or document; (2) date prepared or date notations were made; (3) date of the document if different from #2; (4) who prepared the document, the redacted information, or made the notations on document; (5) for whom the document or redacted information was prepared and to whom the document and redacted information was directed; (6) purpose of preparing the document, preparing the redacted information, or making the notations; (7) number of pages of each document withheld (if any); and (8) basis for withholding discovery.[152]  The City argues that Rural has failed to comply with the Order and as a result, the documents should be admitted without redactions or at least submitted to the Court for an in camera review.  Rural does not object to an in camera review of the documents; accordingly, the Court will grant the City's motion for an in camera review.  Rural should submit the reports in issue under seal for an in camera review to determine whether the information is protected by the attorney-client privilege.

## XI.    CONCLUSION

In conclusion, the City's Motion for Summary Judgment **(Doc. 150)** on Rural's § 1983, declaratory, and injunctive relief claims is denied.  Rural's Partial Motion for Summary

---

[152](Doc. 197.)

Judgment (**Doc. 151**) is granted in part and denied in part.  Judgment is granted as to Rural's

motion for judgment on the City's affirmative defenses of equitable estoppel and statute of

limitations.  Defendant's Motion to Exclude Expert Ray L. Connell (**Doc. 148**) is granted.

Defendant's Motion to Exclude Expert Testimony of James W. Challis (**Doc. 157**) is granted in

part and denied in part as provided above.  Defendant's Motion to Exclude Expert Testimony of

Scott D. Schultz (**Doc. 159**) is granted in part and denied in part as provided above.  Plaintiff's

Motion to Exclude the Expert Testimony of Brain Kingsley (**Doc. 154**) is granted in part and

denied in part as provided above.  Defendant's Motion in Limine to Exclude Evidence of

Alleged Threats to Garber (**Doc. 198**) is denied.  Defendant's Motion to Exclude as Evidence

Letters from City Attorneys (**Doc. 199**) is denied.  Plaintiff's Motion in Limine to Exclude

Evidence of Rural's Alleged Obligation to Provide Fire Protection (**Doc. 214**) is granted.  The

City's Motion for Reconsideration (**Doc. 195**) is denied as moot.  The City's Motion to Dismiss

Supplemental Complaint (**Doc. 226**) is granted.  The City's Motion for In Camera Review (**Doc.**

**228**) is granted.

>        **IT IS SO ORDERED.**

Dated:  <u>March 9, 2009</u>

>                        <u>S/ Julie A. Robinson</u>
>                        JULIE A. ROBINSON
>                        UNITED STATES DISTRICT JUDGE